IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

APRIL MICHELLE LAKE,          )
                              )
          Plaintiff,          )
                              )
v.                            )          CASE NO. 3:11-cv-833-TFM
                              )          [wo]
MICHAEL J. ASTRUE,            )
Commissioner of Social Security  )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

April M. Lake ("Plaintiff" or "Lake") applied for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et seq*., and supplemental security income under Title XVI §§1381-1383c, on June 9, 2008.  Tr. 15. After being denied on August 27, 2008, Lake timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on June 11, 2010.  Tr. 15, 31.  Lake subsequently petitioned for review to the Appeals Council who rejected review of Lake's case on August 5, 2011.  Tr. 1.  As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").  *Id.*  Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c).  After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. NATURE OF THE CASE

Lake seeks judicial review of the Commissioner's decision denying her application

for disability insurance benefits and supplemental security income benefits.  United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence.  42 U.S.C. § 405. The court may affirm, reverse and remand with instructions, or reverse and render a judgment.  *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one.  The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied.  *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)).  Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id.*

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC).  *Id*. at 1238-39.  RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id*.  It also can contain both exertional and nonexertional limitations.  *Id*. at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id*. at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert (VE).  *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*.

## IV.  ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Lake, age 34 at the time of the hearing, has completed the 10th grade and acquired a GED.  *See* Doc. 12 at 4-5.  Lake performed past relevant work as a certified nursing assistant (semi-skilled, medium), housekeeper (unskilled, light), cook (semi-skilled, light), and delivery driver (unskilled, light).  Tr. 31, 64-65.  Lake has not engaged in substantial gainful work activity since her alleged disability onset date of May 28, 2008.

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

Tr. 17.  Lake meets the insured status requirements of the Social Security Act through December 31, 2012.  *Id.*  Lake claims she is unable to work because of asthma, back pain, swelling in her feet and hands, and subsequent to filing her application, Lake claims to suffer from depression and hallucinations.  Tr. 21, 162.  Lake rates her average daily pain as a level seven to eight on a ten point scale with ten being the highest level of pain.  Tr. 52.  It is unknown from the record whether there was a triggering event to cause the alleged disability.

Lake received treatment from various medical practitioners and the ALJ considered the medical records from these practitioners.  Tr. 21-25.  The records from Alexander City Orthopaedics show that Lake was treated in June 2006 for chronic back pain.  Tr. 21.  In May 2007, an MRI scan was "remarkable for facet arthrosis and mild osteoarthritis with no evidence of disc disease, extrusion/protrusion, fracture or subluxation."  *Id.*

Also in May 2007, Lake had a function capacity evaluation done by Rehab Associates, which reveals a validity of 52%; the validity criteria being 81%.  *Id.*  Inconsistencies were noted regarding maximum voluntary effort, occasional material handling, and dissimulation profile.  *Id.*  The physician noted inconsistent scores in 100% of the criteria evaluated, because of such the comments noted that "it was not felt that maximum effort was achieved during this evaluation based on the documented inconsistencies."  *Id.*  The examiner noted that this indicates malingering behavior and suboptimal effort.  *Id.*  Dr. Howorth opined that Lake reached maximum medical improvement, and that there were "no objective findings that would indicate continued

off work activity or limitations of work activities and can return to her regular work activity as a nurse assistant" without restriction.  *Id.*

In October 2007, Lake went to Russell Medical Center with complaints of an injury to her left foot.  Tr. 22.  The medical center found no acute fracture, her alignment was within normal limits, and no focal soft tissue swelling was appreciated.  *Id.*  Lake returned in January 2008 with abdominal pain.  *Id.*  Cat scans did not present any evidence of lesions, obstructions, etc., and the final diagnosis was "no acute intraabdominal abnormality identified."  *Id.*  Lake once again returned in November 2009 with complaints of a tooth ache.  *Id.*  Lake was diagnosed as suffering from gingivitis and generally poor dentition, and was referred to see a dentist.  *Id.*

Lake again presented with back pain in February of 2008, this time to PriCare, P.A.  *Id.*  On February 12, Dr. John James opined that Lake could lift up to 20 pounds and by February 26, he found Lake could return to work with no limitations.  *Id.*  In August of 2008, Dr. Ditch Popov examined Lake for back pain and declared his examination was close to completely normal and that Lake's "complaints are out of proportion to the physical findings and the MRI."  *Id.*

On January 19, 2009, Dr. Heather Rowe completed a Supplemental Questionnaire. Tr. 23.  Dr. Rowe opined that Lake had extreme limitations in activities of daily living, maintaining social functioning, responding to customary work pressures, and responding appropriately to coworkers in a work setting; as well as, marked limitations of concentration, persistence or pace, responding appropriately to supervision in a work

setting, performing simple tasks in a work setting, and performing repetitive tasks in a work setting.  *Id.*

The ALJ declined "to mechanistically and uncritically apply a treating physician rule in place of the evidence as a whole and common sense."  *Id.*  The ALJ stated that Dr. Rowe relied quite heavily on the subjective report of symptoms and limitations provided by Lake and "uncritically accept as true most, if not all," of what Lake reported.  *Id.*  The ALJ found that although Dr. Rowe does have a treating relationship with Lake, "visits have been very sparse and treatment notes even more sparse."  The ALJ found Lake noncompliant in attending treatment and was even terminated by their services as a result. Lake resumed her treatment relationship only after filing for disability with no evidence of decompression during the 2 year absence of treatment.  Tr. 23, 25.  The ALJ, noting that the claimant worked part time, found it "very difficult to see how she could do even that in light of Dr. Rowe's assessment" because if the assessment were taken as true, it is the ALJ's opinion that Lake should be involuntarily confined to an institution.  Tr. 23.

The ALJ also noted that his own observations and the observations of the experts at Lake's hearing influenced his decision.  Tr. 19.  The ALJ stated that Lake came across as neither credible nor physically or mentally disabled.  *Id.*  The ALJ also stated that after a face-to-face interview was held, "no difficulties whatsoever, of any sort, were observed by the examiner."  *Id.*  In addition, in his credibility assessment the ALJ discussed various factors including that Lake currently works part-time, the disability onset date is the date she was fired from her previous employment, she currently (at least up to the time of the hearing) accepts Unemployment Insurance which requires certification that she is "ready,

willing, and able" to work, the lack of objective evidence that Lake is disabled, among others.  Tr. 25-26.  Nonetheless, the ALJ limited Lake's RFC to performing the full range of light work with pain up to the moderate level and all of the mental restrictions established by Dr. Estock.  Tr. 19.

## V.  ISSUES

Lake raises two issues for judicial review:

(1)  Whether the ALJ erred in finding that Lake could perform past relevant work based on the RFC determination; and

(2) Whether the ALJ's mental RFC findings are based on substantial evidence.

*See* Doc. 12 at 4.

## VI.  DISCUSSION

### A.  The ALJ properly found that Lake could perform past relevant work based on the RFC determination.

Lake contends that the ALJ erred in finding that she could perform past relevant work based upon the ALJ's RFC determination.  The ALJ found:

> [Lake] has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) with pain up to the moderate level and all of the mental restrictions dated August 26, 2008 as are fully set forth in the entire RFC Exhibit 7F and the PRTF Exhibit 8F pg. (sic) of Dr. Estock (without the necessity of verbatim recitation or repetition) with the additional restriction of a moderate to marked restriction of the ability to perform detailed and complex tasks, as set forth by the psychological expert, Dr. McKeown.

Tr. 19.  The ALJ later found that Lake is capable of performing past relevant work as a "certified nursing assistant, housekeeper, cook, delivery driver, as well as many other jobs existing in significant numbers in the national economy."  Tr. 31.  The issue that Lake

wishes to be resolved is that the position of certified nursing assistant is a skill level of semi-skilled and a medium physical demands.  Tr. 22, 65.

During the examination of the vocational expert, Dr. Robert Beadles, the ALJ told Dr. Beadles to assess Lake's past relevant work in terms of physical demands and skill level.  Tr. 64.  Dr. Beadles said that Lake's past relevant work includes: certified nursing assistant (semi-skilled, medium), housekeeper (unskilled, light), cook (semi-skilled, light), and delivery driver (unskilled, light).  Tr. 64-65.  The ALJ adopted Dr. Beadles' assessment of Lake's past relevant work and incorporated it into his opinion.  Tr. 31.  The ALJ found that Lake could perform all of her past relevant work as well as other jobs that exist in significant numbers in the national economy.  Tr. 31.  However, Lake correctly points to one minor inconsistency in the ALJ's conclusions.  Lake argues that the ALJ's conclusion that she maintains the RFC to perform the full range of light work with some mental restrictions is inconsistent with his findings that she could return to her past relevant work as a certified nursing assistant, which the ALJ adopted as semi-skilled, medium level work.  *See* Doc. 12 at 7-8; Tr. 19.  According to the ALJ's conclusion, Lake would not be able to return to her past relevant work as a certified nursing assistant.  *See* Doc. 12 at 7-8.

The ALJ made it apparent in his opinion why he chose to include Lake's past relevant work as a certified nursing assistant.  Tr. 22.  After reviewing the medical records of May 2007 provided by Dr. Howorth in which Lake was found to have "reached maximum medical improvement," the ALJ noted that there were "no objective findings that would indicate continued off work activity or limitations of work activities."  *Id.*

Additionally, the ALJ found that according to Dr. Howorth's records, Lake "can return to her regular work activity as a nurse assistant (which is actually medium work requiring a greater functional capacity that we now find) without restriction." *Id.* The ALJ found that although Lake is limited to the full range of light work with some mental limitations, objective medical records provide evidence that Lake could also perform her past relevant work as a certified nursing assistant despite its physical demand level of medium. *Id.*

The ALJ's finding of Lake's ability to perform past relevant work above the physical demand set forth in the RFC assessment is proper in certain circumstances that are set forth in Social Security Ruling 82-61. One such circumstance involves:

> Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it. Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be "not disabled."

SSR 82-61. Dr. Howorth knew of the demands of Lake's job as a nursing assistant, and opined that she has reached maximum medical improvement and can return to her position as a nursing assistant without any further restrictions. Tr. 22. The ALJ took this finding into consideration when despite the fact that the position of nursing assistant is a "greater functional capacity" than he found, the objective medical evidence reported that Lake could perform this particular position without restrictions/limitations. *Id.*

In addition, the ALJ noted other past relevant work that Lake could perform, including housekeeper, cook, and delivery driver. Tr. 31. Each of these three positions have a functional capacity in the light range. Tr. 64-65. Lake contends that because of

her positions at Jamison Inn (housekeeper) and Sneaky Pete's (cook) occurred after her alleged onset date and were not classified as substantial gainful activity, the ALJ erred in considering them past relevant work. *See* Doc. 12 at 9.  However, Lake fails to take into consideration that the vocational expert identified other companies prior to the alleged onset date that Lake has performed as a cook, including Allen Foods and Bowden Oil. Tr. 65-66.  Regarding Lake's position at Jamison Inn, the Court agrees with the ALJ's perception that it would be difficult to accept an argument that Lake is unable to perform past relevant work as a housekeeper since she was still performing the job at the time of the hearing.  Tr. 17-18.  If the Court accepts Lake's argument with regard to Jamison Inn and Sneaky Pete's due to the ALJ concluding them to not be substantially gainful activity, that still leaves the ability to perform past relevant work as a cook (with multiple past employers other than Sneaky Pete's) and as a delivery driver (which was not disputed by Lake).

A claimant "bears the initial burden of proving that she is unable to perform her previous work." *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990); (*citing Cannon v. Bowen*, 858 F.2d 1541, 1544 (11th Cir.1988); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir.1986)).  Here, Lake has failed to make any argument as to why she is unable to perform her past relevant work as delivery driver or as a cook (other than her employment with Sneaky Pete's).  Despite the ALJ's justified reasoning for listing housekeeper as past relevant work, even if the Court accepts Lake's argument, Lake has failed to prove she is unable to perform the remaining past relevant work that the ALJ listed with the assistance of a vocational expert.  Since Lake has failed to meet her burden of proving that she is

unable to perform her previous work, the Court finds that the ALJ properly found that Lake could perform past relevant work based on the RFC determination.

**B.      The ALJ properly based his mental functional capacity findings on substantial evidence.**

Lake argues that the ALJ failed to base his mental functional capacity findings on substantial evidence.  *See* Doc. 12 at 10.  First, Lake claims that the ALJ improperly relied upon the State Agency medical and psychological consultant's/Medical Expert's (non-examining physician) opinion despite the fact that Lake submitted records from a treating physician.[5]  *Id.*  "An administrative law judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless "good cause" is shown to the contrary."  *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985) (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).  However, the Eleventh Circuit has also held "[t]he law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).  In rejecting a treating physician's opinion, the ALJ "must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *MacGregor*, 786 F.2d at 1053.

---

[5] It appears to the Court that Lake may have been confused with regards to the ALJ's discussion of the Medical Expert, as the Medical Expert and State Agency medical consultant are one in the same.  Tr. 20-21.  It appears that Lake mistakes the title of Medical Expert to be that of a primary care physician.  *See* Doc. 12 at 10.  However, the ALJ used "State Agency medical and psychological consultants" and "Medical Expert" interchangeably based upon his review of Social Security Rulings as well as the Code of Federal Regulations where both titles are used.  Tr. 20-21.  Although Lake's argument is based on a misunderstanding, the Court interprets her issue to revolve around the ALJ's adoption of the Medical Expert's opinion over that of Lake's primary care physician.

Here, Lake submitted a <u>Supplemental Questionnaire</u> completed by her treating psychiatrist, Dr. Heather Rowe, and therapist, Dr. Lucy Lawrence.  Tr. 23, 355-359.  Dr. Rowe opined that Lake has:

> extreme limitations in the area of activities of daily living, extreme limitations in the area of maintaining social functioning, marked limitations in the area of concentration, persistence or pace, extreme limitations to respond to customary work pressures, marked limitations to respond appropriately to supervision in a work setting, marked limitations to perform simple tasks in a work setting and marked limitations to perform repetitive tasks in a work setting.

Tr. 23.  The ALJ stated that he "declines to mechanistically and uncritically apply a treating physician rule in place of the evidence as a whole and common sense."  *Id.*  The ALJ then noted a myriad of reasons as to why he chose to discredit Dr. Rowe's opinion. Tr. 23-27.  The ALJ found that Dr. Rowe relied quite heavily on Lake's subjective reports of her symptoms and limitations and uncritically accepted most, if not all, as true.  Tr. 23. Courts have traditionally found that "[c]linical psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment," as a result the ALJ should not outright reject a treating psychologist's opinion because it was based on a claimant's subjective complaints.  *Matthews v. Barnhart*, 347 F. Supp. 2d 1093, 1101 (M.D. Ala. 2003).  However, in *Matthews,* the Court found that there was objective evidence that supported the treating psychologist's opinion.  *Id.*

Here, the ALJ supported his rejection of Dr. Rowe's opinion with a series of objective evidence that tend to refute the limitations that Dr. Rowe has placed on Lake. Tr. 23-26.  First, the medical record is full of examples of treating physicians' suspicions of malingering and complaints that are out of proportion to the findings of medical tests.

Tr. 23, 25.  The ALJ felt these "gross magnifications" lead to Lake's subjective complaints to be less than credible, without objective evidence to support the complaints. *Id.*

The ALJ then turned to the treatment received and the treatment relationship.  Tr. 23-26.  The ALJ notes that Lake was noncompliant in attending mental health treatment at  East Alabama Mental Health Center, and as a result was terminated from their services for her failure to continue therapy in April 2006.  Tr. 23.  Lake returned to East Alabama Mental Health Center to reestablish herself as a patient two days after filing for disability in June 2008, which the ALJ noted was coincidental.  Tr. 22-23.  The ALJ noted that not only was there a two-year gap between treatments, but another one-year gap between her last visit and the hearing.[6]  Tr. 25.  Additionally, the records indicate a four year gap in treatment between 2002 and 2006.  Tr. 53.  The ALJ found this particularly interesting because there is no evidence on the record of any decompression, nervous breakdowns, or hospitalizations during the gaps in treatment.  *Id.*  The ALJ also noted that Lake reported that she is taking medication for her mental illness, but only takes it "sometimes."  Tr. 21.

The Social Security Administration ("SSA") has spoken to the issue of the weight of treating sources, as cited by Lake:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

---

[6] The one-year gap between Lake's last treatment and the hearing before the ALJ is solely noted for issues of decompression and not for non-compliance, because Lake has provided that financial issues prevented her complying during this time period.  Tr. 49.

hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."

20 C.F.R. § 416.927(c)(2), 404.1527(c)(2).  Lake failed to include the second half of the regulation that requires an impairment to be "well supported by medically acceptable clinical and laboratory diagnostic techniques" to be given controlling weight.  *Id.*; *See* Doc. 12 at 11.  Although this case involves subjective symptoms of mental treatment, the ALJ correctly notes that treatment notes are unusually sparse.  Tr. 23.  The ALJ additionally questioned the "longitudinal picture" that is traditionally found with a treating source with the mention of the two year gap in treatment, as well as the sparse visits as a whole.  Tr. 23, 25.  The ALJ made it clear that he did not find that "the nature and severity of [Lake's] impairments is well-supported by medically acceptable [. . .] diagnostic techniques."  20 C.F.R. § 416.927(c)(2), 404.1527(c)(2).

The ALJ also weighed Dr. Doug McKeown's testimony as a Medical Expert in the field of psychology.  Tr. 52-63.  After having reviewed Lake's psychological records and listening to the testimony at the hearing, Dr. McKeown gave his expert opinion of the severity of Lake's condition.  Tr. 52-53.  Dr. McKeown found it to be of concern that there was "no indication of any specific ongoing therapy or treatment," and "no indication that treatment has ever really been reserved."  Tr. 54.  He found that there "was never really follow up or treatment" for any of the mental health related issues that were developed or considered, in part due to noncompliance in 2006 and to the plain lack of treatment in 2008.  Tr. 55.  Because of the "absence of any significant treatment or follow

up," Dr. McKeown found that there is "really no indication that we had any condition that has lasted for a 12-month period or would be expected to last for a 12-month period [. . .] [a]nd would not meet or equal the Secretary's listing." *Id.* Dr. McKeown also found it difficult to find "any decompression issues in work or work like settings based on the fact that [Lake] is intermittently working every now and then," and stated there is no specific indication of any decompression. Tr. 55-56.

Dr. McKeown, a psychiatric specialist with an extensive mental health practice, found that someone with the severity level indicated by Dr. Rowe would "require institutional care if that was in actuality the severity level." Tr. 63. Dr. McKeown also took issue with the sparse visits and treatments in reaching his conclusion. Dr. McKeown stated that Lake's noncompliance does not rule out the diagnosis, but it does give a clear indication that it is "not [of] severe enough nature to be able to develop the severity level that would consider [it] a significant disorder." Tr. 62. Dr. McKeown also stated that one visit with Dr. Rowe is sufficient for a firm diagnosis, but it is not sufficient for the establishment of severity level. Tr. 63. Regarding the lack of treatment, Dr. McKeown found that there are no records or tests that can substantiate what Lake reported, despite the ability of psychologists to run objective tests. Tr. 60, 63.

Dr. McKeown also found Dr. Rowe's assessment to be inconsistent based upon Lake's own actions. Dr. McKeown found that the fact that Lake is working, even though it is only part-time, demonstrates an ability to perform simple tasks in a work setting. Tr. 58. This observation is of interest because it shows "no indication that [Lake's ability is] impaired except by any report of her back pain," and that there is "nothing related to her

mental health issues." *Id.*  This assertion is supported by Lake's own testimony: referring to her previous employment Lake stated, "some days that I was supposed to work I was there but it was some days that I had to call in because of my back;" and referring to her current employment Lake stated, "I do work now like I said but my back gives me problems."  Tr. 42.

However, Dr. McKeown stated that according to Dr. Robert Estock's records, which conflict with Dr. Rowe's assessment, Lake does have a moderate to marked limitation for detailed and complex tasks and mild to moderate in all other areas.  Tr. 56.  Dr. Estock found that Lake suffers from "Probable Schizoaffective Disorder," and chronic depression that is controlled with Wellbutrin; however, it "does not appear to significantly affect work related activities."  Tr. 299-317.  As a result of Dr. McKeown giving weight to Dr. Estock's findings, the ALJ adopted the limitations set forth in Dr. Estock's report.  Tr. 19.

As previously stated the "ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Sryock*, 764 F.2d at 835.  Here, the ALJ found that both the testimony by the Medical Expert as well as the evidence on the record contradict Dr. Rowe's assessment.  Tr. 25.  The ALJ explicitly countered counsel for the claimant's assertion that Dr. McKeown is the only physician who believes Lake can work by citing to "Exhibits 1F, 2F, 4F, 6F, 7F, 8F, and of course the medical expert testimony, all contain reports and assessments, some of them multiple, of physicians who believe that the claimant can work and whose assessments, as interpreted by the vocational expert, indicate an ability to work."  *Id.*  Dr. McKeown found, and the ALJ agreed, that if

Dr. Rowe's assessment were accurate, Lake would not be able to work even on a part-time basis, which she did at the time of the hearing.  Tr. 23, 58.  The ALJ found, and this Court agrees, that the medical records, as well as the medical and vocational expert testimony, directly conflict with the assessment completed by Dr. Rowe.  Tr. 23. Therefore, the Court finds that the ALJ properly rejected the opinion of Dr. Rowe because the evidence supports a contrary conclusion.

Lake additionally claims that the ALJ's conclusion involved a "substitution of judgment for that of a physician or mental health practitioner."  *See* Doc. 12 at 10. Specifically, Lake points to the ALJ's comment that "[s]he came across to myself, the finder of facts, as neither sincere nor credible and neither physically nor mentally disabled" as opposed to considering medical records from treating sources.  *See* Doc. 12 at 10-11.  The law is clear that the ALJ may not substitute his judgment or conclusions for the medical evidence on the record or the diagnosis of a medical professional.  *See Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992).

The ALJ explicitly states that "as the independent finder of facts [he] does not discredit the medical advisors' opinions because he does not find fully credible substantial evidence to discredit them."  Tr. 20.  The ALJ found the assessments of the State Agency experts to be "fully consistent with the reports of the treating and examining physicians and are found to be credible for the reasons stated therein and throughout the decision."  *Id.*  The only physician records that the ALJ found to not be supported by substantial evidence is that of Dr. Rowe.  Since the Court has already found the ALJ

properly rejected Dr. Rowe's assessment because it is contradicted by evidence on the record, the Court finds there was no substitution of judgment for that of a treating physician.

Therefore, the Court finds that the ALJ's mental residual functional capacity findings were based on substantial evidence.

## VII.  Conclusion

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law.  It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.**   A separate judgment is entered herewith.

DONE this 23rd day of August, 2012.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE